IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| LARRY HOWELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 16-cv-160-RJD |
| | ) | |
| KIMBERLY BUTLER, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

**DALY, Magistrate Judge:**

This matter is before the Court on the Motion for Summary Judgment (Doc. 95) filed by Defendants Wexford Health Sources, Inc., Dr. John Trost, Dr. Fe Fuentes, and Susan Kirk, and the Motion for Summary Judgment (Doc. 102) filed by Defendants John Baldwin (official capacity), Clifford Bradley, Kimberly Butler, Salvador Godinez, Louis Shicker, and David Tindall. For the following reasons, the Motion for Summary Judgment (Doc. 95) filed by Wexford Defendants is **GRANTED IN PART AND DENIED IN PART** and the Motion for Summary Judgment (Doc. 102) filed by IDOC Defendants is **GRANTED**.

Plaintiff Larry Howell, an inmate in the custody of the Illinois Department of Corrections ("IDOC"), filed this lawsuit pursuant to 42 U.S.C. § 1983, alleging that his constitutional rights were violated while he was incarcerated at Menard Correctional Center ("Menard"). Following threshold review, Plaintiff proceeds on the following Counts:

**Count 1:** Defendants exhibited deliberate indifference toward Plaintiff's serious medical needs, in violation of the Eighth Amendment, when they delayed and/or denied appropriate treatment for his knee injury.

**Count 2:** Defendants subjected Plaintiff to unconstitutional conditions of confinement at Menard, in violation of the Eighth Amendment, when they placed him in a fifth-floor cell and denied him the use of any assistive medical devices when he was unable to walk.

**Count 3:** Defendant IDOC violated the Americans with Disabilities Act ("ADA") and/or Rehabilitation Act when it denied him the use of any assistive medical devices while he was unable to walk, thereby denying him access to meals and medical services.

As a preliminary matter, the Court recognizes Plaintiff attached a Declaration in Support of Response in Opposition to Motions for Summary Judgment. Plaintiff's Declaration was unsigned. It is well-established that in ruling on a motion for summary judgment, the Court considers only evidence that would be admissible at trial. *See Woods v. City of Chicago,* 234 F.3d 979, 988 (7th Cir.2000). To be admissible, testimony must be sworn, for example, in an affidavit or in a deposition. If it is not, the Court must disregard it. *See Pfeil v. Rogers,* 757 F.2d 850, 859 (7th Cir.1985); *see, e.g., Garner v. Kinnear Mfg. Co.,* 37 F.3d 263, 268-69 (7th Cir.1994). Plaintiff's Declaration testimony is neither sworn as true before a notary public nor sworn under penalty of perjury in the body of his statement, *see* 28 U.S.C. § 1746, either of which would have rendered his statement admissible for summary judgment purposes. *See Pfeil,* 757 F.2d at 859. The Court cannot therefore consider the Declaration in ruling on this motion. Further, even if the Declaration had been sworn, to the extent the Declaration testimony contradicts Plaintiff's deposition testimony, it would not be considered. Parties cannot "thwart the purposes of Rule 56 by creating 'sham' issues of fact with affidavits that contradict their prior depositions." *Bank of Illinois v. Allied Signal Safety Restraint Sys.,* 75 F.3d 1162, 1168 (7th Cir. 1996); *Diliberti v. United States,* 817 F.2d 1259, 1263 (7th Cir.1987).

### FACTUAL BACKGROUND

On May 4, 2014, Plaintiff fell while playing basketball at Menard (Plaintiff's Deposition,

Doc. 96-7 at 7-8). Plaintiff was taken via wheelchair to the health care unit (Id. at 9). Plaintiff was seen by a nurse for his complaints of knee pain (Plaintiff's Medical Records, Doc. 96-1 at 45). Plaintiff rated his pain level at a "10" (Id.). Plaintiff's knee was wrapped with an Ace bandage, he was given bags of ice and Ibuprofen (400 mg for 7 days), he was instructed to elevate the knee, and an appointment was made for Plaintiff to see a doctor the following day (Id.).

On May 5, 2014, Plaintiff was seen by Dr. Trost who conducted an examination and ordered an x-ray of Plaintiff's knee (Id. at 49). The x-ray revealed Plaintiff did not suffer any broken bones (Id. at 50). Plaintiff was to be discharged from the HCU, but upon reporting he could not walk, Trost admitted him to the HCU for further observation (Id. at 50-53). Throughout his stay in the HCU, Plaintiff reported to nurses that his knee hurt and that he could not walk (Id. at 54-57).

On May 6, 2014, Plaintiff was seen by Dr. Fuentes who examined Plaintiff's knee and noted no swelling or tenderness (Doc. 96-1 at 58). Plaintiff reported to Fuentes he could not walk (Id.). Fuentes discharged Plaintiff from the HCU back to his cell with an order for Motrin (400 mg x one week) and a two-week follow-up (Id.). On May 6, 2014 at 9:30 a.m., a nurse charted she spoke with Fuentes regarding Plaintiff being insistent about getting a left knee MRI (Id.). The medical record indicates Fuentes and nursing staff informed Plaintiff his knee was not severe enough to require further diagnostic testing because no swelling was noted (Id.).

On May 6, 2014, Defendants Tindall, Seavers, and Carter informed Plaintiff he was discharged, and they were escorting him back to his cell (Doc. 96-7 at 16). Plaintiff requested a wheelchair from Sgt. Tindall (Id.). Defendant Tindall checked with Dr. Fuentes to determine whether Plaintiff required the use of a wheelchair (Doc. 113 at 3). Dr. Fuentes determined no wheelchair was necessary because no swelling was observed, and Plaintiff was "ambulatory per

security" (Doc. 96 at 3, 96-1 at 58).   No wheelchair was provided, and Plaintiff alleges he had to hop up two flights of stairs and approximately 50 feet back to his cell (Doc. 96-7 at 17, 31). Plaintiff testified that he hopped back to his cell "with the assistance of [an] inmate" (Doc. 96-7 at 17).   That same day Plaintiff filed a grievance regarding the treatment of his knee (Id. at 28).

On May 7, 2014, Plaintiff fell in his cell and Sgt. Bradley responded (Doc. 96-7 at 29). Plaintiff later filed a grievance against Bradley alleging he was verbally abusive when he responded to Plaintiff's fall (Id. at 29).   Plaintiff testified he did not suffer any injuries or harm as a result of the incident with Bradley (Id. at 30).   Plaintiff was taken to the health care unit via wheelchair (Doc. 96-7 at 10, 30).   In the health care unit, Plaintiff was seen by Dr. Fuentes who examined Plaintiff and charted "unable to stand on [left] foot…[rule out] torn ACL" (Doc. 96-1 at 61).   Fuentes referred Plaintiff to Trost and noted he needed to go back to his cell in a wheelchair (Id.).   Fuentes provided a "medical lay-in" from May 7, 2014 through May 12, 2014 (Plaintiff's Complaint, Doc. 1).   On May 8, 2014, Fuentes made a special service referral and recommended a CT scan or MRI to rule out a torn meniscus due to the May 4, 2014 injury (Doc. 96-1 at 321). Trost recommended an alternative plan of "NSAID medication, knee brace sleeve, no exercise, and limited use, rest as much as possible, follow up with Dr. Fuentes and resubmit if symptoms do not improve" (Id. at 321).

On May 12, 2014, Plaintiff was seen by Trost who examined the left knee and noted swelling and tenderness, as well as some laxity (Doc. 96-1 at 63).   Trost issued a medical lay-in and a follow-up visit to see if there was any change in condition (Id. at 63).   On May 19, 2014, Plaintiff was seen by Trost who noted the swelling and tenderness persisted (Id.).   Trost increased Plaintiff's dosage of pain medication, ordered a medical lay-in through June 19, 2014, and referred Plaintiff's case to collegial review for an MRI (Id.).

On May 29, 2014, Trost presented Plaintiff's case to collegial review and recommended a CT scan or MRI of his left knee (Doc. 96-1 at 64). Collegial denied the request and recommended a repeat x-ray of Plaintiff's knee (Id.). On June 2, 2014, Plaintiff had the repeat x-ray indicating no change in condition (Id. at 67). Plaintiff continued to complain of extreme pain (Id.). On June 12, 2014, Trost again presented Plaintiff's case for collegial review (Id. at 71). Plaintiff was approved for an MRI of his left knee (Id)

On July 1, 2014, Plaintiff was sent to Touchette Regional Hospital for an MRI consultation (Doc. 96-4). The findings indicated Plaintiff had an anterior cruciate ligament ("ACL") tear, medial and lateral meniscus tears, and moderate joint effusion (Id. at 7).

On July 14, 2014, Plaintiff alleges Defendant Bradley refused to allow Plaintiff to use a wheelchair to go to a dental appointment (Doc. 1 at 13-14). Plaintiff was escorted to the dental appointment by Correctional Officer Todero (Doc. 96-7 at 29). To get to the health care unit, Plaintiff had to go down two flights of stairs (Id.). To do so, Plaintiff had to ease down to the floor and scoot down the stairs on his buttocks (Id., Doc. 1 at 14). Plaintiff made his way to the health care unit and received a dental x-ray (Doc. 1 at 14). Plaintiff testified he did not suffer any additional injuries or harm as a result of not having a wheelchair, only humiliation from scooting down the stairs (Doc. 96-7 ay 29, 35, 37). On July 14, 2014, Nurse Practitioner Moldenhauer issued Plaintiff a low-bunk and low-gallery permit (Doc. 96-2 at 280).

On July 15, 2014, Trost informed Plaintiff of the MRI results, ordered a medical lay-in for one month, and referred Plaintiff's case to collegial review for an orthopedic consultation (Doc. 96-1 at 77). On July 31, 2014, Trost presented Plaintiff's case at collegial review and recommended an orthopedic consultation which was approved (Id. at 84-85).

On August 11, 2014, Plaintiff was scheduled for an orthopedic consultation with Dr. Koth

at Orthopedic Institute of Southern Illinois on August 27, 2014 (Id. at 87).   On August 27, 2014,

Plaintiff presented to Koth for an orthopedic consultation (Doc. 96-5).   Koth noted the clinical

radiographic impression was medial and lateral meniscal tears, and an ACL tear.   Koth charted

the following plan:

> We did discuss options with him.   Unfortunately his situation is going [to] preclude
> bracing and preclude the significant rehab.   Therefore, I am not sure doing an ACL
> reconstruction with a meniscal repair is in his best interest.   I am going to check with the
> prison system to see if there is a way we can get him into therapy or at least bracing if that
> is an option.   If it is, then we will consider doing an ACL reconstruction primarily.
> Otherwise we will consider doing a meniscectomy versus meniscus repair once we know
> what the living situation is for the patient.   If he is unable to wear a brace and unable to
> participate with physical therapy then doing an ACL reconstruction might not be in his best
> interest.   I would recommend a knee arthroscopy, a partial meniscectomy, continue range
> of motion and then see how well he does.   If he does not get the stability he is looking for
> in his knee and continues to have pain and problems, then we will consider doing an ACL
> reconstruction at that point in time.   I am going to check with the prison system and then
> recommend the best course of action.

(Id. at 5).

On September 16, 2014, Trost and Plaintiff discussed the orthopedic consultation and Trost

presented Plaintiff for collegial review (Doc. 96-1 at 96).   On September 17, 2014, Plaintiff's case

was presented at collegial review and based on the recommendation of Koth, Plaintiff's

meniscectomy was approved (Id. at 96).

On October 7, 2014, Koth performed a left knee partial lateral meniscectomy, left knee

partial medial meniscectomy, and left knee partial synovectomy (Doc. 96-5 at 8).   Koth noted the

Indication for Procedure as follows:

> This is a 34-year-old black male who injured his left knee while in prison.   He has some
> instability problems and pain in the left knee.   His main complaint is his pain in the knee
> currently.   Recommendations, we did discuss multiple options including a meniscus tear,
> and ACL reconstruction.   I did speak with the prison staff extensively about the possibility
> of doing an ACL reconstruction and the requirement for extensive rehabilitation.   The
> patient was well aware of the risks.   After further discussion, I did think that with the
> patient's best interest is to try and just do partial medial and partial lateral meniscectomies,

allow the patient to recover, and then see the patient back and we look further to see if there is something else in the form of an ACL reconstruction we could do if it becomes absolutely necessary because I do not think that the rehab situation of being in prison is the most favorable for him and, therefore, I would elect to hold off and not doing an ACL reconstruction unless it becomes absolutely necessary.   He voiced understanding of this.

(Doc. 96-5 at 8).

On October 8, 2014, Trost saw Plaintiff and ordered him Ibuprofen (800 mg) and an XL knee sleeve (Doc. 96-1 at 103).   Trost also provided a medical lay-in (Id.).   On October 13, 2014, Trost saw Plaintiff and charted Plaintiff was ambulating and complaining of knee pain (Id. at 111). Trost issued Plaintiff a slow-walk permit for one month (Id.).

On October 22, 2014, Koth saw Plaintiff for a post-surgical follow-up appointment and charted the following:

This is a well-appearing man.   No acute distress.   On physical evaluation he has range of motion 0 to 90 without significant difficulty.   His swelling has improved significantly. No residual swelling is evident at the present time.   He is still complaining of muscle atrophy after disuse and is wondering if this is going to come back.   He was questioning again the ACL reconstruction, as I told him, we are not going to plan on ACL reconstruction unless it becomes absolutely necessary because I do not believe that his prison setting will be the best setting for rehab.   Our goal is to give him more of a painless knee.

(Doc. 96-5 at 10).

On October 30, 2014, Trost presented Plaintiff in collegial for a second follow-up with Koth which was approved and scheduled to occur on November 21, 2014 (Doc. 96-1 at 123).   Dr. Koth saw Plaintiff on November 21, 2014 and charted the following:

My recommendation at this point in time, based on his situation, that he is better served without surgery if we can avoid it.   I would recommend a functional brace, ACL type brace, to see if it is able to help him get around better.   As a last resort we would discuss surgery in the form of an ACL reconstruction, which would be prudent, but I do think that should be the last resort given his current situation.   We will monitor his progress.   I will see him back in roughly three months for evaluation.   He is going to try to continue to rehab the knee himself.   If there are any questions, problems or concerns I will be available and patient was asked to call.

(Doc. 96-5 at 11).

On December 1, 2014, Trost saw Plaintiff who requested ACL reconstruction and a left knee brace (Doc. 96-1 at 135). Trost ordered a left ACL brace which was issued on December 5, 2014 (Id. at 135-136). Plaintiff clarified he received a knee sleeve, rather than a knee brace (Doc. 96-2 at 287). Trost testified that only compression braces without any hard plastic or metal are allowed within the institution pursuant to IDOC policy because of security concerns (Doc. 96-8 at 46).

On January 1, 2015, Plaintiff filed a grievance with the Administrative Review Board regarding the medical treatment for his knee and received a response on August 13, 2015 (Doc. 107-3 at 12).

On March 21, 2015, Plaintiff was seen in the HCU and stated he needed low-gallery, low-bunk, front-cuff, and knee sleeve permits (Doc. 96-1 at 138-139). He also requested information regarding approval for an ACL repair surgery and whether he could be transferred to an institution which provided physical therapy (Id.). On March 23, 2015, Plaintiff filed an additional grievance regarding medical treatment for his knee and grieved he was not receiving the prescribed ACL knee brace (Doc. 107-3 at 13).

On April 10, 2015, Trost presented Plaintiff for collegial review related to the ACL repair surgery, but an alternative treatment plan for physical therapy evaluation was ordered (Id. at 143). On April 23, 2015, Plaintiff had a physical therapy consultation at Memorial Hospital of Carbondale Doc. 96-6 at 3). Plaintiff was provided with additional exercises to perform in furtherance of physical therapy (Id. at 11). On June 16, 2015, Plaintiff presented to the health care unit with complaints of knee pain which he rated at 7 out of 10 and it was charted by the nurse

that he walks with a limp (Doc. 96-1 at 145).   On June 22, 2015, Plaintiff saw Trost and reported the physical therapy was ineffective (Id. at 146).

On September 15, 2015, Plaintiff was examined by Defendant Susan Kirk, RN, and rated his knee pain as 10 (Doc. 96-1 at 149).   Kirk referred Plaintiff to see a doctor (Id.).   On October 1, 2015, a nurse practitioner saw Plaintiff for a follow-up regarding his knee pain and noted Trost planned to present Plaintiff to collegial for consideration of further treatment (Id. at 151).

On November 9, 2015, Trost presented Plaintiff to collegial for an orthopedic consultation, which was denied, and additional information was requested as to what kind of therapy had been completed (Doc. 96-2 at 7).

On January 8, 2016, the Health Care Unit received a copy of a DC545 written by a correctional officer and witnessed by Lt. Qualls, stating "inmate noted 1/7/16 10:00 AM doing free squats with 300-pound bar while on yard" (Doc. 96-1 at 158).   Plaintiff disputes that he was doing full squats on this date.

On January 13, 2016, Plaintiff's case was presented for collegial review by Trost and an MRI was approved and took place on January 26, 2016, at St. Joseph's Memorial Hospital (Id. at 159, Doc. 96-6 at 31-32).   On January 29, 2016, Plaintiff was examined by W. Rankin, M.D. at Menard for continued complaints of knee pain (Doc. 96-1 at 164).   Rankin charted "walks well, can do about 60% of full squat, no tenderness" (Id.).   On February 18, 2016, Plaintiff was re-evaluated regarding physical therapy recommendation and the nurse practitioner charted "admits he did not comply, attempts to discuss benefit of PT to no avail" (Doc. 96-1 at 167).   Plaintiff disputes he did not comply with physical therapy.   On February 29, 2016, Trost presented Plaintiff for collegial review requesting an orthopedic consultation to evaluate the January 26, 2016 MRI results (Doc. 96-2 at 9).   The request was denied and more information as to what types of therapy

had been tried was requested (Id. at 10-11).   On March 15, 2016, the orthopedic consultation was approved (Id. at 12).

On April 1, 2016, Plaintiff was scheduled for an orthopedic consult for his chronic left knee pain on April 29, 2016 (Doc. 96-1 at 175).   On April 29, 2016, Plaintiff was seen by Gretchen Mason, PA-C, who recommended proceeding with the left ACL reconstruction (Doc. 96-5 at 14). Following the recommendation, on May 6, 2016, Trost presented Plaintiff's case to collegial for the ACL reconstruction which was approved (Doc. 96-2 at 15).   On June 23, 2016, Plaintiff underwent an ACL reconstruction surgery performed by Dr. Roland Barr (Doc. 96-5 at 15-16).

Plaintiff was issued a medical lay-in permit after he was injured (Doc. 96-7 at 36). Plaintiff had a medical lay-in permit the entire time until he had his first surgery (Id. at 36, 39). Plaintiff was issued an additional medical lay-in permit after his second surgery (Id.).   Due to the fact that Plaintiff had a medical lay-in permit prescribed by a doctor, he was generally not allowed to leave his cell except to go to the Health Care Unit and to be shaken down (Id. at 36).   During the time Plaintiff had medical lay-in permits, his meals were brought to him in his cell (Id. at 33).

Plaintiff testified at his deposition he is suing Defendant Louis Shicker because he believes Shicker was the regional medical director for Wexford (Doc. 96-7 at 31).   Plaintiff testified that he does not have any evidence Shicker was aware of his medical conditions (Id.).   Plaintiff further testified he does not have any evidence Shicker denied or delayed his health care in any way (Id.). Plaintiff is suing Salvador Godinez because he allegedly denied Plaintiff's grievances (Doc. 96-7 at 36).   Plaintiff does not know if Godinez personally reviewed any of Plaintiff's grievances (Id.). Plaintiff is suing Kimberly Butler because he filed grievances regarding his medical care and believes as warden, she should have made things go more quickly (Id. at 34).   Plaintiff testified he thought she had the authority to tell them to prescribe him crutches, canes, wheelchairs, etc. (Id.

at 35).   During the time Plaintiff was writing letters and grievances to Defendant Butler, Plaintiff was being seen by the health care unit and Dr. Trost (Id.).   Plaintiff does not know if Butler took any action to deny or delay Plaintiff's receipt of medical treatment (Id. at 31).

## LEGAL STANDARD

Summary judgment is appropriate only if the moving party can demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322(1986); *see also Ruffin-Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005).   The moving party bears the initial burden of demonstrating the lack of any genuine issue of material fact. *Celotex*, 477 U.S. at 323.   Once a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).   A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Estate of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017) (quoting *Anderson*, 477 U.S. at 248).   In determining a summary judgment motion, the Court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party.   *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted).

## DISCUSSION

### Count 1 - Deliberate Indifference

The Eighth Amendment protects inmates from cruel and unusual punishment.   U.S. Const., amend. VIII; *see also Berry v. Peterman*, 604 F.3d 435 (7th Cir. 2010).   As the Supreme Court has recognized, "deliberate indifference to serious medical needs of prisoners" may constitute cruel and unusual punishment under the Eighth Amendment.   *Estelle v. Gamble*, 429

U.S. 97, 104 (1976). In order to prevail on such a claim, the plaintiff must first show that his condition was "objectively, sufficiently serious" and second, that the "prison officials acted with a sufficiently culpable state of mind." *Greeno v. Daley*, 414 F.3d 645, 652-53 (7th Cir. 2005) (citations and quotation marks omitted).

The following circumstances are indicative of an objectively serious condition: "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Hayes v. Snyder*, 546 F.3d 516, 522-23 (7th Cir. 2008) (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997)); *see also Foelker v. Outagamie Cnty.*, 394 F.3d 510, 512-13 (7th Cir. 2005) ("A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.").

An inmate must also show that prison officials acted with a sufficiently culpable state of mind, namely deliberate indifference. Put another way, the plaintiff must demonstrate that the officials were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that the officials actually drew that inference. *Greeno*, 414 F.3d at 653. A plaintiff does not have to prove that his complaints were "literally ignored," but only that "the defendants' responses were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Hayes*, 546 F.3d at 524 (quoting *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000)). Negligence, gross negligence, or even recklessness as that term is used in tort cases, is not enough. *Id.* at 653; *Shockley v. Jones*, 823, F.2d 1068, 1072 (7th Cir. 1987). Also, "mere disagreement with the course of the inmate's medical treatment does not constitute an Eighth Amendment claim of deliberate indifference. *Snipes v. DeTella*, 95

F.3d 586, 591 (7th Cir. 1996).

The medical defendants do not dispute that Plaintiff's knee injury constitutes a serious medical condition that was diagnosed by a physician as needing treatment. The analysis of Plaintiff's deliberate indifference claims will consider the subjective prong and review the actions of each medical Defendant.

**Defendant Fuentes**

Plaintiff was seen by Dr. Fuentes on May 6, 2014 and May 7, 2014. Plaintiff alleges Fuentes was deliberately indifferent to his knee injury when she refused to order an MRI and use of a wheelchair on May 6, 2014. Defendant Fuentes asserts she relied on medical judgment in deciding Plaintiff's course of treatment on both May 6, 2014 and May 7, 2014.

On May 6, 2014, Plaintiff was seen by Fuentes for complaints of knee pain following the injury that had occurred two days prior. Fuentes examined Plaintiff's knee and noted no swelling or tenderness. Fuentes noted an x-ray had been performed and was negative. Fuentes diagnosed Plaintiff with a knee sprain and recommended he be discharged. When Plaintiff requested an MRI, Fuentes explained there was no clinical indication for an MRI at the time. Fuentes ordered Motrin for Plaintiff's pain and requested a two-week follow-up appointment. Fuentes determined a wheelchair was not necessary as Plaintiff was ambulatory. While Plaintiff disagrees with Fuentes' determination that an MRI and wheelchair were not necessary at the time, mere disagreement with his medical treatment at one appointment does not constitute an Eighth Amendment claim of deliberate indifference.

On May 7, 2014, Fuentes saw Plaintiff after he fell in his cell. Based upon the fact Plaintiff reported he had fallen because he could not put pressure on his knee, Fuentes recommended ruling out a torn ACL and referred Plaintiff to Dr. Trost for further evaluation. Fuentes also ordered a

wheelchair and a medical lay-in permit. There is no evidence in the record Fuentes acted with deliberate indifference to Plaintiff's serious medical needs at either appointment on May 6, 2014 or May 7, 2014. At both appointments, Fuentes examined Plaintiff and relied on her medical judgment to determine the course of treatment for Plaintiff. Defendant Fuentes is entitled to summary judgment on Plaintiff's claim of deliberate indifference.

**Defendant Trost**

Plaintiff alleges Trost was deliberately indifferent to his knee injury by delaying necessary medical care. Plaintiff asserts Trost should have ordered an MRI sooner than he did and that waiting more than three weeks to do so was an unreasonable delay. Plaintiff further argues that he did not receive the meniscus surgery until nearly five months after his injury and the ACL surgery more than two years after the injury – all while under the care of Trost. Plaintiff asserts because of the delay in receiving his surgeries, he suffered severe pain for two years. Plaintiff also alleged Trost was deliberately indifferent to his care for failing to provide an ACL brace and physical therapy as recommended by Dr. Koth.

Defendant Trost asserts he provided consistent and timely care to Plaintiff and that the delay in Plaintiff receiving the ACL surgery was based upon the medical judgment and recommendation by the orthopedic specialist, Dr. Koth. Trost further argues Plaintiff was provided a compression knee brace rather than the recommended metal ACL brace due to security concerns and prison procedures outside of his control.

The record shows Trost began treating Plaintiff's knee injury on May 5, 2014. Trost ordered an x-ray and when the results were negative, he recommended a conservative course of treatment consisting of pain medication, limited use, and rest. Trost persisted in this course of treatment throughout the month of May and when Plaintiff's pain persisted, Trost referred

Plaintiff's case to collegial review for an MRI on May 29, 2014. The MRI was initially denied and Trost resubmitted Plaintiff to collegial review for an MRI on June 12, 2014. An MRI was approved on this date and Plaintiff underwent the MRI on July 1, 2014 which indicated an ACL tear and meniscus tears. Based on the MRI results, Trost referred Plaintiff to collegial for an orthopedic consult on July 31, 2014, which was approved. On August 11, 2014, Plaintiff was seen by orthopedic specialist, Dr. Koth, for evaluation of his knee injury. Plaintiff underwent surgery on his knee on October 7, 2014.

The evidence is not sufficient to establish a claim of deliberate indifference for the care Trost provided from the time of Plaintiff's injury through October 2014, when Plaintiff received surgery on his knee. Trost examined Plaintiff immediately after the injury and recommended a course of treatment. When the conservative course of treatment was proven to be ineffective after three weeks, Trost recommended further diagnostic testing. After Trost's first recommendation was denied, he sought approval a second time two weeks later and an MRI was approved. When the MRI results indicated Plaintiff had an ACL tear and meniscus tears, Trost sought and gained approval to send Plaintiff to an orthopedic specialist. While Plaintiff alleges three months between the date of the injury and the date he saw a specialist was an unreasonable delay, this is not sufficient to establish Trost acted with deliberate indifference. Trost examined Plaintiff, determined a course of treatment, and when that course of treatment proved to be ineffective, Trost acted to recommend additional diagnostic testing and further treatment within weeks of Plaintiff's injury.

As to the choice to perform a meniscectomy, rather than a complete ACL reconstruction, the medical records from Dr. Koth make clear that in his medical judgment it was in the best interest of Plaintiff to initially undergo meniscectomy surgery and that an ACL reconstruction

surgery was not to be done unless it became absolutely necessary. Based upon Koth's recommendation, Trost referred Plaintiff to collegial review for the meniscectomy surgery which was approved. Plaintiff underwent the meniscus surgery on October 7, 2014. There is no evidence that any delay with scheduling the surgery to be performed by Dr. Koth was within the control of Trost.

Following the meniscus surgery, Koth recommended Plaintiff receive an ACL brace, but Plaintiff alleges he only ever received a knee sleeve. It is undisputed that due to security concerns only compression braces without any hard plastic or metal are allowed within the institution pursuant to IDOC policy. Defendant Trost's order for a knee sleeve rather than a metal ACL brace due to security concerns is not sufficient to establish he acted with deliberate indifference to Plaintiff's medical needs.

Following Plaintiff's meniscus surgery, he continued to report complaints of severe knee pain over the course of the next twenty months. Trost continually treated Plaintiff throughout 2015 and 2016 and recommended ibuprofen for pain as needed. In April 2015, Trost presented Plaintiff for collegial review for ACL repair surgery, but an alternative treatment plan for physical therapy evaluation was ordered. Plaintiff was sent out for a physical therapy consultation at Memorial Hospital of Carbondale and Plaintiff was provided with additional exercises to perform in furtherance of physical therapy. Plaintiff continued to complain of pain throughout 2015 and reported to Trost the physical therapy was ineffective. In November 2015, Plaintiff's pain persisted and Trost again presented Plaintiff's case to collegial for an orthopedic consultation, which was denied. In January 2016, Trost presented Plaintiff for collegial review for an MRI which was approved. On February 29, 2016, Trost presented Plaintiff for collegial review requesting an orthopedic consultation to evaluate the January 26, 2016 MRI results which request

was denied with a request for more information as to what types of therapy had been tried was requested.   On March 15, 2016, an orthopedic consultation was approved.

On April 1, 2016, Plaintiff was scheduled for an orthopedic consult for his chronic left knee pain on April 29, 2016.   On April 29, 2016, Plaintiff was seen by Gretchen Mason, PA-C, who recommended proceeding with the left ACL reconstruction.   Following the recommendation, on May 6, 2016, Trost presented Plaintiff's case to collegial for the ACL reconstruction which was approved.   On June 23, 2016, Plaintiff underwent an ACL reconstruction surgery performed by Dr. Roldan Barr.

As espoused by the Seventh Circuit in *Greeno v. Anderson*, persistence in a course of treatment known to be ineffective may violate the Eighth Amendment.   414 F.3d 645, 655 (7th Cir. 2005) (finding that a genuine issue of material fact existed as to whether physician was deliberately indifferent to prisoner's deteriorating medical condition by continuing to persist with course of treatment that had been ineffective); *see also Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006) (stating that "medical personnel cannot simply resort to an easier course of treatment that they know is ineffective").   While the Court finds there is insufficient evidence for a claim of deliberate indifference for the treatment provided by Trost from May 5, 2014 through October 7, 2014, a reasonable jury could find that following Plaintiff's knee surgery in October 2014, Trost persisted in a course of treatment that was ineffective, resulting in Plaintiff continually suffering pain for twenty months.   Accordingly, there is a genuine issue of material fact in this case, which precludes summary judgment on the merits as to Dr. Trost.

**Defendant Kirk**

Plaintiff alleges Defendant Susan Kirk, RN was deliberately indifferent to his serious medical needs when she repeatedly ignored his sick call requests throughout the summer of 2015.

There is no evidence in the record of Plaintiff's sick call requests submitted to Defendant Kirk. The medical records indicate Plaintiff was seen on multiple occasions by medical professionals during the summer of 2015. The records indicate Defendant Kirk saw Plaintiff on September 15, 2015, for complaints of knee pain and that she referred Plaintiff to a physician. Plaintiff was seen on October 1, 2015, by a nurse practitioner for a follow-up regarding his knee pain. There is no evidence in the record that Defendant Kirk acted with deliberate indifference to Plaintiff's serious medical needs. Defendant Kirk is entitled to summary judgment on Plaintiff's claim of deliberate indifference.

**Defendant Wexford**

When a private corporation has contracted to provide essential government services, such as health care for inmates, the corporation cannot be held liable under § 1983 unless the constitutional violation was caused by an unconstitutional policy or custom of the corporation itself. *Shields*, 746 F.3d at 789; *see also Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). Accordingly, in order for Plaintiff to recover from Wexford, he must offer evidence that his injury was caused by a Wexford policy, custom, or practice of deliberate indifference to medical needs, or a series of bad acts that together raise the inference of such a policy. *Id.* at 796. He must also offer evidence showing that the policymakers were aware of the risk created by the custom or practice and failed to take appropriate steps to protect him. *Thomas v. Cook County Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2009).

Plaintiff's deliberate indifference claim against Defendant Wexford is premised on its alleged maintenance of a policy of failing to train their doctors to treat knee injuries and a policy of disregarding the recommendations of its clinicians through the collegial review process. Defendant Wexford contends it is entitled to summary judgment because there is no evidence that

any policy or practice of Wexford violated Plaintiff's constitutional rights or was the driving force behind any constitutionally insufficient treatment. Plaintiff alleges his ACL surgery was delayed because Trost's recommendations for orthopedic consultations were denied on multiple occasions.

Viewing the facts in the light most favorable to Plaintiff, a jury could find that Wexford's policy regarding collegial review for outside specialty consultations resulted in Plaintiff continually suffering pain. Accordingly, there is a genuine issue of material fact in this case, which precludes summary judgment on the merits as to Wexford.

**Defendants Shicker, Godinez, and Butler**

Plaintiff alleges Shicker, Godinez, and Butler were deliberately indifferent to his serious medical needs because they either personally signed grievances or responded to Plaintiff's grievances on their corporate letterhead. Plaintiff further alleges Defendants Butler and Godinez had actual knowledge of his medical condition and of Dr. Koth's recommendation for an ACL brace and ACL surgery and acquiesced in their subordinate's persistent mistreatment and delay of medical care.

Prison officials cannot be held liable under a *respondeat superior* theory and Plaintiff cannot show Defendants Shicker, Godinez, and Butler were personally involved in the denial of medical care. If a prisoner is under the care of prison medical professionals, a non-medical prison official "will generally be justified in believing that the prisoner is in capable hands." *Giles v. Godinez*, 914 F.3d 1040, 1049-50 (7th Cir. 2019); *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011) (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)). In contrast, a prison official may be found to be deliberately indifferent to a prisoner's serious medical needs if "they have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *Hayes v. Snyder,* 546 F.3d 516, 527 (7th Cir. 2008); *see also Reed v.*

*McBride,* 178 F.3d 849, 854-56 (7th Cir. 1999) (warden was required to act when prison officials repeatedly denied an inmate life-sustaining medication and food). Prison officials who simply processed or reviewed inmate grievances lack personal involvement in the conduct forming the basis of the grievance. *Owens v. Evans*, 878 F.3d 559, 563 (7th Cir. 2017); *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001). Plaintiff testified he sued Shicker, Godinez, and Butler because they were responsible for reviewing his grievances. There is no evidence Defendants Shicker, Godinez, or Butler were personally involved in denying medical treatment for Plaintiff's serious medical needs. Defendants Shicker, Godinez, and Butler are entitled to summary judgment on Plaintiff's claim of deliberate indifference.

**Defendant Tindall**

Plaintiff alleges Defendant Tindall acted with deliberate indifference to his serious medical need by refusing to provide him a wheelchair on May 6, 2014. It is undisputed that Defendant Fuentes made the determination that it was not medically necessary that Plaintiff be escorted back to his cell in a wheelchair. As stated above, when an inmate is under the care of prison medical professionals, a non-medical prison official is justified in relying on their medical judgment. Defendant Tindall was justified in following the recommendation of Dr. Fuentes regarding whether Plaintiff required the use of a wheelchair on May 6, 2014. Defendant Tindall is entitled to summary judgment on Plaintiff's claim of deliberate indifference.

**Defendant Bradley**

Plaintiff alleges Defendant Bradley was deliberately indifferent to Plaintiff's serious medical needs by (1) being verbally abusive when he responded to Plaintiff's fall on May 7, 2014, and (2) refusing to provide Plaintiff a wheelchair to attend his dental appointment on July 14, 2014. Plaintiff alleges Bradley was aware he had an order from a doctor to use a wheelchair, but instead

forced Plaintiff to scoot down two flights of stairs on his buttocks in order to attend his dental appointment.   Defendant Bradley asserts Plaintiff was not refused medical care on May 7, 2014. Bradley further argues there is no evidence he knew Plaintiff had an order for use of a wheelchair on July 14, 2014, and Plaintiff did not suffer any injuries or harm from the incident in which Plaintiff allegedly had to scoot down the stairs.

Verbal threats or abuse are insufficient to state a constitutional violation pursuant to § 1983.   *See Patton v. Przybylski,* 822 F.2d 697 (7th Cir.1987); *Moore v. Marketplace Restaurant,* 754 F.2d 1336 (7th Cir.1985).   While the alleged conduct of Defendant Bradley on May 7, 2014, may be considered unprofessional, it does not give rise to a constitutional claim.   It is unclear to the Court whether Plaintiff is alleging a delay in his treatment due to the verbal altercation with Bradley, however, Plaintiff testified he did receive medical treatment on May 7, 2014 and he did not suffer any injuries or harm as a result of his interaction with Bradley.   There is no evidence Bradley acted with deliberate indifference to Plaintiff's serious medical needs on May 7, 2014.

While there is some question as to whether Defendant Bradley was aware Plaintiff had an order for a wheelchair on July 14, 2014, Plaintiff testified that he did not suffer any injury or harm other than humiliation from the denial of the wheelchair.   Because Plaintiff did not suffer any harm or injury as a result of the alleged actions of Defendant Bradley, Bradley is entitled to summary judgment on Plaintiff's claim of deliberate indifference.

### Count II – Conditions of Confinement

Although the Eighth Amendment prohibits "cruel and unusual punishment" of an inmate, not all prison conditions trigger Eighth Amendment scrutiny.   *James v. Milwaukee County*, 956 F.2d 696, 699 (7th Cir. 1992).   In *Wilson v. Seiter*, 501 U.S. 294 (1991), the Supreme Court instructed courts evaluating claims of unconstitutional conditions of confinement to consider: (1)

whether the defendant prison officials acted with the requisite state of mind (the subjective component) and (2) whether the alleged deprivations were sufficiently serious to rise to the level of a constitutional violation (the objective component).   Officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must "take reasonable measures to guarantee the safety of the inmates."   *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).   To establish his Eighth Amendment claim, Plaintiff must show that he was subjected to conditions that denied him "the minimal civilized measure of life's necessities" *and* that Defendants acted with a culpable state of mind.   *Gillis v. Litscher*, 468 F.3d 488, 491 (7th Cir. 2006) (citing *Farmer*, 511 U.S. 825 at 847 ("[A] prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.") (other citations omitted)).

Plaintiff alleges Defendants subjected him to unconstitutional conditions by denying him access to wheelchairs, crutches, a walker, an ACL brace, or other such devices even though such assistive devices were recommended by his treating physicians.   Plaintiff further alleges he was never provided a low-gallery permit.   Plaintiff argues he was cruelly confined to his cell and when he had to leave his cell he had to hop on one foot, scoot on his buttocks, or be carried by other inmates to get anywhere within Menard.   Plaintiff alleges he suffered indignities and missed scheduled meals and medical appointments as a result of not having access to assistive devices.

Wexford Defendants argue Dr. Fuentes ordered Plaintiff be transported via wheelchair on May 7, 2014, and Dr. Trost ordered numerous permits including those for a left knee sleeve/brace, medical lay-in, low-bunk, low-gallery, slow-walk, and front-cuff.   Wexford Defendants further assert Plaintiff was not allowed a hard plastic or metal knee brace due to IDOC security policy.

IDOC Defendants argue Plaintiff was provided medical lay-in permits which limited the circumstances under which Plaintiff had to leave his cell. IDOC Defendants assert Plaintiff only complains of two instances where he had difficulty ascending and descending stairs to and from the health care unit due to lack of assistive devices. Defendants argue Plaintiff admits he did not suffer any injuries or harm as a result of the May 6, 2014, or July 14, 2014, incidents.

There is no evidence in the record Plaintiff missed meals or medical appointments as a result of his conditions of confinement. Plaintiff testified at his deposition that his meals were brought to his cell during the time of his medical lay-in permits. Although Plaintiff testified that he suffered humiliation while ambulating to two medical appointments, this is not sufficient to establish cruel and unusual punishment. Further, Plaintiff has failed to establish there was a substantial risk of serious harm when he was not provided a wheelchair on May 6, 2014 and July 14, 2014. Plaintiff testified he received assistance from another inmate in ascending the stairs on May 6, 2014 and that he was able to scoot down the stairs without incident on July 14, 2014. Further, Plaintiff has failed to establish that Defendants knew of a substantial risk of serious harm and consciously disregarded it. Defendants are entitled to summary judgment on Plaintiff's conditions of confinement claim.

### Count III – ADA/RA

Plaintiff alleges Defendant IDOC violated the ADA and RA by failing to make accommodations for his injured knee. Plaintiff alleges the denial of assistive devices prevented him from going to medical appointments, meals, and leaving his cell. Defendants assert Plaintiff's claimed injury is not the type normally considered a disability under the ADA or RA. Defendants further argue Plaintiff has provided no evidence that he was denied access to meals or medical services. Defendants assert Plaintiff's claims for compensatory damages under the ADA

and RA are barred because he cannot provide evidence showing Defendants intentionally discriminated against him, and that the PLRA bars compensatory damages because Plaintiff fails to allege he suffered any physical injury as a result of not being provided assistive devices.

This Court addresses Plaintiff's Rehabilitation Act claim together with his ADA claims because the same analysis governs both claims. *See Foley v. City of Lafayette, Ind.*, 359 F.3d 925, 928 (7th Cir. 2004). Under both statutes, Plaintiff must show that: (1) he is a qualified person; (2) with a disability; and (3) IDOC denied him access to a program or activity because of his disability. *Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012). The ADA defines a disability as either "a physical or mental impairment that substantially limits one or more major life activities"; "a record of such an impairment"; or "being regarded as having such an impairment." 42 U.S.C. § 12102(1); *see also* 29 U.S.C. § 705(9)(b) (Rehabilitation Act's definition of disability refers to the ADA). Major life activities include walking, standing, bending, and caring for oneself. *Jaros*, 684 F.3d at 672.

The ADA does not categorically exclude temporary impairments from its definition of a disability. *See Summers v. Altarum Inst., Corp.*, 740 F.3d 325, 333 (2d Cir. 2014). That said, the "duration of an impairment" may help determine "whether the impairment substantially limits a major life activity." *Id.* at 329. Impairments that last only for a short period of time are typically not covered under the ADA unless they are sufficiently severe. *See* 29 C.F.R. § 1630.2(j)(1)(ix) (app.). Examples of temporary, non-disabling impairments include "broken limbs, sprained joints, concussions, and influenza"—in other words, "non-chronic impairments" with "little or no long term or permanent impact." *Id.* Many district courts have found that run-of-the-mill short-term injuries do not qualify as disabilities under the ADA. *See Clark v. Boyd Tunica, Inc.*, No. 3:14-cv-00204, 2016 WL 853529, at *4 (N.D. Miss. Mar. 1, 2016) (broken foot

that took two months to heal did not qualify as a disability under the ADA); *Martinez v. N.Y. State Div. of Human Rights*, No. 1:13-cv-1252-GHW, 2015 WL 437399, at *7–10 (S.D.N.Y. Feb. 2, 2015) (temporary injuries from fall did not constitute a disability); *Mastrio v. Eurest Servs., Inc.*, No. 3:13-cv-564, 2014 WL 840229, at *4–5 (D. Conn. Mar. 4, 2014) (short-term pain from kidney stones did not qualify as a disability); *Budhun v. Reading Hosp. & Med. Ctr.*, No. 10-6921, 2011 WL 2746009, at *2–3 (E.D. Pa. July 14, 2011) (broken finger did not qualify as a disability); *see also Idell M. v. Vilsack*, E.E.O.C. Doc. 0120140792, 2016 WL 4426506, at *2 (E.E.O.C. Aug. 4, 2016) (affirming finding that ordinary, temporary recovery from foot surgery did not qualify as a disability).

Here, while Plaintiff alleges the injury to his knee and subsequent recovery from knee surgery impaired his ability to walk, the Court finds that Plaintiff's injury to his knee was a temporary, non-chronic condition that does not qualify as a disability under the ADA. Even if Plaintiff had a qualifying disability, however, his failure to accommodate claims would still fail. As set forth above, Plaintiff was issued a low-gallery permit, low-bunk permit, front-cuff permit, and multiple lay-in permits that allowed his meals to be delivered to his cell. Further, while Plaintiff may have disagreed with the medical treatment he received, his medical records indicate he consistently had access to medical professionals for treatment of his condition. Defendants are entitled to summary judgment on Plaintiff's ADA and RA failure to accommodate claims.

### CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment (Doc. 95) filed by Wexford Defendants is **GRANTED IN PART AND DENIED IN PART**; the Motion for Summary Judgment (Doc. 102) filed by IDOC Defendants is **GRANTED**; and the Clerk of Court is **DIRECTED** to enter judgment for Defendants Fe Fuentes, Susan Kirk, John Baldwin (official

capacity), Clifford Bradley, Kimberly Butler, Salvador Godinez, Louis Shicker, and David Tindall and against Plaintiff at the close of the case.

Plaintiff will proceed to trial in this case on the following count:

**Count 1:**     Defendants Trost and Wexford exhibited deliberate indifference toward Plaintiff's serious medical needs, in violation of the Eighth Amendment, when they delayed and/or denied appropriate treatment for his knee injury from October 2014 through June 2016.

**IT IS SO ORDERED.**

**DATED:   April 25, 2019**

*s/ Reona J. Daly*
**Hon. Reona J. Daly**
**United States Magistrate Judge**
